UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EDWARD FRANCO-LOPEZ,

Plaintiff,

-against-

LOUIS MOLINA,
FRANK DWYER,
CHARLTON LEMON,
MARIO JULIEN,
MARGREATA THOMPSON,
FRANKLIN HOLMES,
EDWARD HORTON,
VINCENT FUCA,
NATHANIEL WILLIAMSON,
DOES 1-15, and
CITY OF NEW YORK,

Defendants.

**Complaint**

Case No. 25-cv-00702

**Plaintiff Demands
Trial by Jury**

Plaintiff Edward Franco-Lopez, by and through his attorneys at Kopke Christiana & Rastetter LLP, hereby alleges as follows:

### Introduction

1.      This is a civil rights and defamation action brought pursuant to 42 U.S.C. § 1983 and New York law.

2.      In November of 2023, Plaintiff was working as a public defender in the Queens office of the Legal Aid Society.

3.      On the morning of November 8th, Plaintiff was at his office preparing for the most important day of his career. Later that morning, he was scheduled to begin the first day of his first jury trial. While this would be an important milestone in the career of any attorney, it

was particularly significant for Plaintiff, who immigrated to the United States as a child and spent decades educating himself and diligently pursuing his ambition to become a trial lawyer.

4.      Within hours, however, Plaintiff's ambition was dashed, and through absolutely no fault of his own, he found himself not in the courtroom advocating for his client, but in a jail cell, while the commissioner of the Department of Correction and his underlings maliciously plotted to defame him to the New York Post.

5.      As will be explained in detail, the commissioner and the other defendants used Plaintiff as a pawn in their legal, political, and public relations battle with Legal Aid, and in so doing, they caused Plaintiff to suffer catastrophic injuries, both to his mental and emotional well-being and to the professional reputation he had worked so hard to cultivate.

6.      Plaintiff now brings this action to clear his good name and hold the defendants accountable for the damage they have done.

## Jurisdiction and Venue

7.      This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. This action is also brought pursuant to the New York State Constitution and the laws of the City and State of New York.

8.      Jurisdiction over Plaintiff's federal claims is conferred by 28 U.S.C. § 1343, which provides for jurisdiction over all actions brought pursuant to § 1983, and by 28 U.S.C. § 1331, which provides for jurisdiction over all cases brought under the Constitution and laws of the United States.

9.     Jurisdiction over Plaintiff's state law claims is conferred by 28 U.S.C. § 1367, which provides for jurisdiction over state law claims that are sufficiently related to federal claims.

10.     Venue is proper in the Eastern District of New York pursuant 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

11.     Plaintiff timely filed a Notice of Claim with the New York City Comptroller's Office pursuant to General Municipal Law § 50-e, and the Comptroller's Office designated his claim as number 2024PI003172.

12.     Plaintiff appeared for a hearing pursuant to General Municipal Law § 50-h on March 14, 2024.

13.     Plaintiff's claims were not adjusted by the Comptroller's Office within the period of time provided by statute.

## PARTIES

14.     At all relevant times, Plaintiff EDWARD FRANCO-LOPEZ ("Plaintiff" or "Mr. Franco-Lopez") was a resident of the County of Queens in the City and State of New York. Plaintiff was licensed to practice law in the State of New York and was employed as a public defender for the Legal Aid Society ("Legal Aid").

15.     Defendant CITY OF NEW YORK ("the City") is a municipal corporation, organized and existing under the laws of the State of New York.

16.     The City, by and through its officials at the Department of Correction ("DOC"), is responsible for the custody and care of pre-trial detainees who are awaiting trial in

the City's criminal courts. DOC is also responsible for the operation and maintenance of the detention facilities located at the Queens County Criminal Court ("Queens Court"), 125-01 Queens Boulevard, Kew Gardens, NY 11415, and the Queens Detention Complex ("QDC"), 126-01 82nd Avenue, Kew Gardens, NY 11415.

17.     At all relevant times, Defendant LOUIS MOLINA ("Molina" or "Defendant Molina") was employed by the City as the commissioner of DOC.

18.     At all relevant times, Defendant Molina was acting under color of state law and within the scope of his employment for the City as commissioner of DOC. Molina is sued in his individual capacity.

19.     At all relevant times, Defendant FRANK DWYER ("Dwyer" or "Defendant Dwyer") was employed by DOC as the deputy commissioner for public information.

20.     At all relevant times, Defendant Dwyer was acting under color of state law and within the scope of his employment for DOC as the deputy commissioner for public information. Dwyer is sued in his individual capacity.

21.     At all relevant times, Defendant CHARLTON LEMON ("Lemon" or "Defendant Lemon") was employed by DOC as a warden and assigned as the acting assistant chief of security and custody management.

22.     At all relevant times, Defendant Lemon was acting under color of state law and within the scope of his employment for DOC as a warden and acting assistant chief of security and custody management. Lemon is sued in his individual capacity.

23.     At all relevant times, Defendant MARIO JULIEN (Shield No. 140) ("Julien" or "Defendant Julien") was employed by DOC as an assistant deputy warden and assigned to Queens Court/QDC as the executive officer.

24.     At all relevant times, Defendant Julien was acting under color of state law and within scope of his employment for DOC as an assistant deputy warden and executive officer of Queens Court/QDC. Julien is sued in his individual capacity.

25.     At all relevant times, Defendant MARGREATA THOMPSON (Shield No. 1311) ("Thompson" or "Defendant Thompson") was employed by DOC as a captain and assigned to Queens Court/QDC as the tour commander.

26.     At all relevant times, Defendant Thompson was acting under color of state law and within the scope of her employment for DOC as a captain and tour commander of Queens Court/QDC. Thompson is sued in her individual capacity.

27.     At all relevant times, Defendant FRANKLIN HOLMES (Shield No. 295) ("Holmes" or "Defendant Holmes") was employed by DOC as a captain and assigned to Queens Court/QDC as the deputy warden for security.

28.     At all relevant times, Defendant Holmes was acting under color of state law and within the scope of his employment for DOC as a captain and the deputy warden for security of Queens Court/QDC. Holmes is sued in his individual capacity.

29.     At all relevant times, Defendant EDWARD HORTON (Tax ID No. 632740) ("Horton" or "Defendant Horton") was employed by DOC as a captain and assigned to the Correction Intelligence Bureau ("CIB").

30.     At all relevant times, Defendant Horton was acting under color of state law and within the scope of his employment for DOC as a CIB captain. Horton is sued in his individual capacity.

31.     At all relevant times, Defendant VINCENT FUCA (Tax ID No. 519117) ("Fuca" or "Defendant Fuca") was employed by DOC as a captain and assigned to CIB.

32.     At all relevant times, Defendant Fuca was acting under color of state law and within the scope of his employment for DOC as a CIB captain. Fuca is sued in his individual capacity.

33.     At all relevant times, Defendant NATHANIEL WILLIAMSON (Shield No. 406, Tax ID No. 509919) ("Williamson" or "Defendant Williamson") was employed by DOC as a correction officer investigator and assigned to CIB.

34.     At all relevant times, Defendant Williamson was acting under color of state law and within the scope of his employment for DOC as a CIB correction officer investigator. Williamson is sued in his individual capacity.

35.     At all relevant times, Defendants DOES 1-5 ("Does 1-5" or "Defendants Does 1-5") were officers and other officials employed by DOC, the New York Police Department ("NYPD"), or the Queens District Attorney's Office who were personally involved in, or failed to intervene to prevent, the violations of Plaintiff's rights that occurred on or after November 8, 2023 and are described in this complaint.

36.     At all relevant times, Defendants Does 1-5 were acting under color of state law and within the scope of their employment for DOC, the NYPD, or the Queens District Attorney's Office. They are sued in their individual capacities.

37.     The true names and identities of Defendants Does 1-5 are not currently known to Plaintiff. However, they are/were employees or agents of DOC, NYPD, or the Queens District Attorney's Office. Accordingly, they are entitled to representation by the Law Department upon request, pursuant to General Municipal Law § 50-k, and to indemnification by the City for any liability arising from the conduct described in this complaint.

38.     The Law Department is hereby notified that: (a) Plaintiff intends to name Defendants Does 1-5 as defendants in an amended pleading once their true names and shield numbers/tax identification numbers are known; and (b) the Law Department should immediately begin preparing their defense in this action.

39.     At all relevant times, Defendants DOES 6-10 ("Does 6-10" or "Defendants Does 6-10") were supervising officers and other supervisory officials who were employed by DOC, NYPD, or the Queens District Attorney's Office and who were personally involved in, or failed to intervene to prevent, the violations of Plaintiff's rights that occurred on or after November 8, 2023 and are described in this complaint.

40.     At all relevant times, Defendants Does 6-10 were acting under color of state law and within the scope of their employment for DOC, NYPD, or the Queens District Attorney's Office. They are sued in their individual capacities.

41.     The true names and identities of Defendants Does 6-10 are not currently known to Plaintiff. However, they are/were employees or agents of DOC, NYPD, or the Queens District Attorney's Office. Accordingly, they are entitled to representation by the Law Department upon request, pursuant to General Municipal Law § 50-k, and to indemnification by the City for any liability arising from the conduct described in this complaint.

42.     The Law Department is hereby notified that: (a) Plaintiff intends to name Defendants Does 6-10 as defendants in an amended pleading once their true names and shield numbers/tax identification numbers are known; and (b) the Law Department should immediately begin preparing their defense in this action.

43.     At all relevant times, Defendants DOES 11-15 ("Does 11-15" or "Defendants Does 11-15") were officers or other officials who were employed by DOC, NYPD, or the Queens District Attorney's Office and who were personally involved in making false and defamatory statements about Plaintiff to members of the news media on or after November 8, 2023. Does 11-15 include the officer(s) or official(s) who were the "law enforcement source" who "insisted" to a New York Post reporter that "nothing had changed and the attorney [Plaintiff] was wearing the shoes."[1]

44.     At all relevant times, Defendants Does 11-15 were acting under color of state law and within the scope of their employment for DOC, NYPD, or the Queens District Attorney's Office. They are sued in their individual capacities.

45.     The true names and identities of Defendants Does 11-15 are not currently known to Plaintiff. However, they are/were employees or agents of DOC, NYPD, or the Queens District Attorney's Office. Accordingly, they are entitled to representation by the Law Department upon request, pursuant to General Municipal Law § 50-k, and to indemnification by the City for any liability arising from the conduct described in this complaint.

---

[1]     Joe Marino & Amanda Woods, *Legal Aid lawyer busted for smuggling marijuana in penny loafers to NYC inmate: officials*, N.Y. POST (Nov. 9, 2023, 6:29 PM), https://nypost.com/2023/11/09/metro/lawyer-busted-for-for-smuggling-marijuana-in-shoes-to-nyc-inmate-officials.

46. The Law Department is hereby notified that: (a) Plaintiff intends to name Defendants Does 11-15 as defendants in an amended pleading once their true names and shield numbers/tax identification numbers are known; and (b) the Law Department should immediately begin preparing their defense in this action.

47. In this complaint, Defendants Molina, Dwyer, Lemon, Julien, Thompson, Holmes, Horton, Fuca, Williamson, and Does 1-15 are referred to collectively as the "Individual Defendants."

48. At all relevant times, the Individual Defendants were acting under color of state law and within the course and scope of their duties and functions as officers, officials, employees, agents, or servants for the City, DOC, NYPD, or the Queens District Attorney's Office, or were otherwise engaged in conduct that was incidental to the performance of these duties and functions.

49. At all relevant times, the Individual Defendants were acting for, and on behalf of, the City, DOC, NYPD, or the Queens District Attorney's Office, and were acting pursuant to the power and authority vested in them as officers, officials, employees, agents, or servants of these entities.

50. At all relevant times, the Individual Defendants were engaged in a joint venture and assisted each other in committing the acts and omissions described in this complaint.

51. Each of the Individual Defendants is entitled to indemnification by the City under New York law and/or contract for any liability arising from the conduct described in this complaint.

52.     Plaintiff graduated from the CUNY School of Law in 2019 and immediately began working as a public defender in Legal Aid's Queens office.

53.     As described in the introduction to this complaint, on the morning of November 8, 2023, Plaintiff was at his office preparing for the first day of his first jury trial.

54.     While Plaintiff was preparing for the day, his co-counsel, Robert Flink, sent him a text message informing him that a woman named Madison had reached out, identified herself as their client's stepsister, and requested their assistance in providing trial clothes to their client.

55.     Mr. Flink also told Plaintiff that Madison would contact him directly to coordinate the provision of the trial clothes.

56.     Presently, Madison reached out to Plaintiff and agreed to meet him in the lobby of his office, which was located across the street from the courthouse.

57.     Plaintiff then proceeded to the lobby carrying a suit jacket, dress pants, and tie for his client.

58.     Eventually, Madison arrived carrying a shopping bag containing an orange shoebox and a dress shirt for Plaintiff's client.

59.     Upon Madison's arrival, Plaintiff opened the shoebox, looked inside, and confirmed that it contained a standard pair of men's dress shoes.

60.     At approximately 9:53 a.m., Plaintiff and Madison left the office and walked to the courthouse.



61. At approximately 9:57 a.m., Plaintiff and Madison entered the courthouse, and she handed the shopping bag to Plaintiff.



62. The two then walked to the courtroom of the Hon. Stephen Knopf, where Plaintiff dropped off his bag, overcoat, and other personal belongings.

63.     At approximately 10:01 a.m., Plaintiff exited the courtroom and proceeded to QDC, where his client was being held.



64.     Upon his arrival at QDC, Plaintiff handed the DOC officers his Office of Court Administration ("OCA") Secure Pass and the trial clothes, including the suit jacket, dress pants, and tie provided by Legal Aid, and the shoes and dress shirt, provided by Madison.

65.     When Plaintiff handed the trial clothes to the DOC officers, he explained that they were for his client, whose trial was scheduled to begin later that morning.

66.     After receiving the trial clothes, a DOC officer ran them through an x-ray scanner and noticed what appeared to be contraband hidden in the heels of the shoes Madison had provided.

67.     DOC officers took the shoes apart and discovered four plastic bags, which were wrapped in black electrical tape and contained a total of 32.8 grams of marijuana.

68.     At approximately 10:15 a.m., the DOC officers handcuffed Plaintiff and placed him in a cell.

69.     One or more of the DOC officers then walked to Judge Knopf's courtroom and informed the court that Plaintiff had been arrested for attempting to smuggle contraband into QDC.

70.     Upon hearing this, Madison left the courtroom.

71.     Mr. Flink then informed the court that Plaintiff was innocent because the shoes had been provided by Madison.

72.      As Madison was the client's family member, the court found that a conflict had arisen and adjourned the trial for appointment of new counsel.

73.     Meanwhile, the Individual Defendants commenced an investigation.

74.     During their investigation, the Individual Defendants obtained evidence and information confirming that the shoes had been provided by Madison and that Plaintiff had no reason to know that marijuana was hidden in the heels.

75.     This included, among other things, information provided by Mr. Flink and other Legal Aid employees and surveillance footage showing that it was Madison who had provided the shoes.

76.     At no point during the investigation did the Individual Defendants obtain a single shred of evidence or information to support the conclusion that Plaintiff knew what was hidden in the heels. To the contrary, all of the evidence and information obtained by the Individual Defendants supported the opposite conclusion.

77.     Of course, the Individual Defendants also knew, based on their own observations and the available evidence, that Plaintiff was not wearing the shoes in which the marijuana was discovered.

78.     As the investigation definitively established that Plaintiff did not knowingly attempt to smuggle contraband into QDC, any probable cause supporting Plaintiff's arrest dissipated.

79.     Accordingly, at approximately 12:00 p.m., Defendant Williamson released Plaintiff, saying he was free to go because "there's nothing here."

80.     Distraught and traumatized, Plaintiff returned to his office.

81.     When Defendant Williamson's superiors, including Defendants Molina, Dwyer, Lemon, Julien, Thompson, Holmes, Horton, Fuca, and Does 6-15, learned of Plaintiff's release, they were not pleased.

82.     In the preceding months, DOC, and Molina in particular, had received a slew of bad press based on their misconduct and contentious relationship with the federal monitor and plaintiffs' counsel, including Legal Aid, in *Nunez v. City of New York*, No. 11-cv-5845 (S.D.N.Y.). Indeed, Molina had recently learned that, as a result of his misconduct, he was being removed from his position as commissioner.[2]

---

[2]     *See, e.g.*, Reuven Blau, *Federal Monitor Blasts Department of Correction Commissioner Over Incidents in Jails*, THE CITY (June 12, 2023, 6:52 PM), https://www.thecity.nyc/2023/06/12/federal-monitor-blasts-correction-commissioner; Jonah E. Bromwich, William K. Rashbaum & Jan Ransom, *New York's Embattled Jails Leader Gets a New Job in City Hall*, N.Y. TIMES (Oct. 31, 2023), https://www.nytimes.com/2023/10/31/nyregion/louis-molina-deputy-mayor-safety.html?smid=url-share; Giulia Heyward, *Legal Aid Society condemns NYC jail system for unsanitary living conditions outlined in report*, GOTHAMIST (Nov. 6, 2023),

83.     While Plaintiff will not attempt to describe all of Molina's bad press in this complaint, it should be noted that the press included allegations that he was directly involved in covering up inmate deaths, obstructing the work of the federal monitor, and improperly insinuating himself in DOC investigations and public relations matters.[3]

84.     As a result, Defendant Molina and his underlings were eager to lash out and score political points against their adversaries, including in Legal Aid.

85.     To this end, Molina and Dwyer had seized upon an earlier incident involving a Legal Aid employee whom they accused of attempting to smuggle contraband into a DOC facility.[4]

86.     After that incident, Defendant Molina personally held a press briefing where he described the employee as "despicable" and accused her of "undermin[ing] all the hard work we are doing to stabilize this department after years of neglect by the previous administration[.]"[5]

---

https://gothamist.com/news/legal-aid-society-condemns-nyc-jail-system-for-unsanitary-living-conditions-outlined-in-report; Marcia Kramer & Elijah Westbrook, *Rikers Island still not in compliance with several court orders, federal monitor reports*, CBS News (July 11, 2023, 6:10 PM), https://www.cbsnews.com/newyork/news/rikers-island-federal-monitor-report-july-2023; Jan Ransom, *Once Praised, Jails Chief Draws Ire Over Lack of Transparency on Rikers*, N.Y. Times (July 25, 2023), https://www.nytimes.com/2023/07/25/nyregion/rikers-island-jail-chief-molina.html?smid=url-share.

[3]     *See, e.g.*, Bromwich, Rashbaum & Ransom, *supra* note 2; Ransom, *supra* note 2.

[4]     *See* Rich Calder, *Legal Aid staffer posing as lawyer busted smuggling weed into Rikers, sources say*, N.Y. Post (May 6, 2023, 12:47 PM), https://nypost.com/2023/05/06/legal-aid-society-staffer-busted-smuggling-weed-onto-rikers.

[5]     *See id.*

87.     Accordingly, when Defendants Molina and Dwyer learned of Plaintiff's arrest, they immediately sprang into action and ordered their subordinates, including Defendants Lemon, Julien, Thompson, Holmes, Horton, Fuca, Williamson, and Does 1-15, to cause Plaintiff to be re-arrested and issued a Desk Appearance Ticket ("DAT") charging him with promoting prison contraband.

88.     Upon receiving this order, Defendant Williamson called Plaintiff and instructed him to return to QDC for re-arrest and processing.

89.     Plaintiff complied, and at approximately 1:00 p.m., he presented himself at QDC.

90.     Williamson then re-arrested Plaintiff and once again placed him in a cell.

91.     Eventually, Defendant Williamson removed Plaintiff from the cell, placed him in handcuffs, and took his fingerprints.

92.     During this time, Plaintiff was paraded through the courthouse in handcuffs in front of his colleagues, judges, and court employees.

93.     After Plaintiff was processed, at approximately 5:36 p.m., Williamson issued a DAT and initiated a prosecution against Plaintiff for a crime of which the Individual Defendants knew he was innocent.[6]

94.     Indeed, while Plaintiff was being processed and before Williamson issued the DAT, the Queens District Attorney had already concluded that Madison was the true suspect.

---

[6]     *See* N.Y. PENAL LAW § 205.20(1) ("A person is guilty of promoting prison contraband in the second degree when . . . [h]e **knowingly** and unlawfully introduces any contraband into a detention facility.") (Emphasis added).

95.     At 2:50 p.m., nearly three hours before Plaintiff's DAT was issued, Public Corruption Bureau Chief Khadijah Muhammad Starling and ADA Christina Oliveri explained to their detectives that Madison was the individual who had provided the shoes in which the marijuana was discovered and that she was "the suspect for promoting prison contraband into Queens Criminal Court."

96.     Nevertheless, the Individual Defendants were determined to see Plaintiff prosecuted.

97.     As if Plaintiff's false arrest and malicious prosecution were not enough, at some point on November 8 or 9, 2023, one or more of the Individual Defendants falsely told a New York Post reporter named Amanda Woods ("Ms. Woods") that Plaintiff had been arrested and prosecuted for smuggling marijuana in **his own** penny loafers.

98.     Thereafter, on November 9, 2023, Ms. Woods emailed Defendant Dwyer, informed him that she had been told that Plaintiff was "allegedly smuggling weed stuffed inside his penny loafers[,]" and sought Dwyer's confirmation and comments.

99.     In response, Defendant Dwyer confirmed that Plaintiff had been arrested and charged. Dwyer also stated "[o]n background, . . . [w]hen [Plaintiff] was going through the x-ray machine (which was operated by DOC Officers) they noticed objects **in his shoes** and found the contraband." (Emphasis added).

100.    Dwyer also offered to get Ms. Woods "a quote from Commissioner Molina as well."

101.    Ten minutes later, Defendant Dwyer emailed the following quote to Molina for approval:

Sadly, for the second time this year, an individual meant to practice and uphold the law has engaged in despicable, criminal behavior that endangers the lives of people in custody and our Officers. I commend our Officers for the work in this instance, and for each time they prevent weapons, narcotics, and all forms of contraband from entering our facilities.

102. Defendant Molina approved the quote, and at 3:05 p.m., Dwyer emailed it to Ms. Woods, describing it as a "[s]tatement from Commissioner Louis A. Molina."

103. Upon information and belief, the language in Molina's statement about "the second time this year" was a reference to the incident described in paragraphs 85–86, which was also reported in the New York Post.[7]

104. At 6:29 p.m., the Post published an article using Plaintiff's full name, which was picked up and widely disseminated by various media outlets across the country and internationally.[8]

105. The article, which relied exclusively on facts and information provided by "Department of Correction and law enforcement sources," including the Individual Defendants, contained numerous false and defamatory statements, including the following:

> a. "A Legal Aid Society lawyer was arrested this week for allegedly smuggling marijuana—hidden inside **his penny loafers**—to an inmate at a Queens courthouse, officials said."

---

[7]    *See* Calder, *supra* note 4.

[8]    *See* Marino & Woods, *supra* note 1; *see also, e.g.*, Miguel Cruz Tejada, *Un abogado hispano arrestado por llevarle marihuana en sus zapatos a preso que defendía en tribunal de Queens*, LA VERDAD (Nov. 10, 2023), https://laverdad.com.do/2023/11/10/un-abogado-hispano-arrestado-por-llevarle-marihuana-en-sus-zapatos-a-preso-que-defendia-en-tribunal-de-queens.

b. "Officers noticed that two objects were wrapped in blue electrical tape and hidden in the heels **of Franco-Lopez's shoes**, sources said. . . . That's where the drugs . . . were recovered, the DOC said."

c. "Legal Aid Attorney Edward Stevens Franco-Lopez was found with the leafy substance stuffed inside **his loafers**, officials said."

d. "'Sadly, for the second time this year, an individual meant to practice and uphold the law has engaged in despicable, criminal behavior that endangers the lives of people in custody and our officers,' DOC Commissioner Louis A. Molina said in a statement." [9]

106. The next day, a member of Legal Aid's press office spoke to the Post and vigorously objected to the allegation that Plaintiff had been wearing the shoes in which the marijuana was discovered. [10]

107. After speaking with Legal Aid's representative, the Post followed up with their DOC sources, including the Individual Defendants, about the discrepancy. [11]

108. But rather than correct the record, the Individual Defendants doubled down on their false and defamatory statements, "insist[ing] to The Post that nothing had changed and the attorney [Plaintiff] was wearing the shoes." [12]

109. On or about November 27, 2023, all charges were dismissed, and the prosecution was terminated in Plaintiff's favor.

---

[9]    Marino & Woods, *supra* note 1 (emphases added).

[10]    *See id.*

[11]    *See id.*

[12]    *See id.*

## Injuries to Plaintiff

110.     As a result of the Individual Defendants' intentional, malicious, and reckless conduct, Plaintiff suffered a deprivation of his liberty including being forcibly confined and imprisoned for over four hours. The Attorney Grievance Committee initiated an investigation of Plaintiff, and he was also stripped of his OCA Secure Pass, making it impossible for him to perform his duties as a public defender. Not only was Plaintiff unable to visit his clients in DOC facilities, he was unable to make court appearances because, had he done so, the court would have been required to inform his clients that he was being prosecuted. Moreover, Plaintiff suffered catastrophic damage to his professional reputation because it was widely reported that he was a "despicable criminal[,]" who had knowingly attempted to smuggle marijuana into a DOC facility.

111.     Accordingly, the Individual Defendants are liable to Plaintiff for his loss of liberty, past and future pain and suffering, past and future mental and emotional injury and distress, past and future humiliation and degradation, past and future damage to his professional reputation, and past and future economic losses.

112.     Because the Individual Defendants' conduct was intentional, malicious, reckless, and undertaken with blatant disregard of Plaintiff's civil rights, they are also liable for punitive damages. And because the Individual Defendants' conduct was undertaken within the course and scope of their employment, the City is liable to Plaintiff under the doctrine of *respondeat superior*.

113.     Each of the following causes of action falls within one or more of the exceptions set forth in New York's Civil Practice Law & Rules 1602 with respect to joint and several liability.

## Claims for Relief

### First Claim—False Arrest in Violation of the Fourth Amendment
### (42 U.S.C. § 1983)

#### *Against the Individual Defendants*

114.     Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

115.     The Individual Defendants arrested and detained Plaintiff without probable cause or other legal justification when, after initially releasing him, they ordered him to return to QDC for re-arrest and processing.

116.     This arrest and detention was especially unreasonable because, at the time of Plaintiff's re-arrest, any arguable probable cause had long since dissipated.

117.     As a result of the aforementioned acts and omissions, the Individual Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures, and the Individual Defendants are therefore liable to Plaintiff for damages under 42 U.S.C. § 1983.

### Second Claim—Abuse of Process in Violation of the Fourth and Fourteenth Amendments
### (42 U.S.C. § 1983)

#### *Against the Individual Defendants*

118.     Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

119.     Without probable cause or other legal justification, the Individual

Defendants improperly utilized judicial process in the form of a DAT, which the Individual

Defendants caused to be issued well after any arguable probable cause had dissipated.

120.     In so doing, the Individual Defendants were substantially motivated by a

desire to retaliate against, inflict harm on, and score political points against Plaintiff and Legal

Aid.

121.     As a result of the aforementioned acts and omissions, the Individual

Defendants violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from

unreasonable and unlawful searches and seizures and to be afforded due process of law. The

Individual Defendants are therefore liable to Plaintiff for damages under 42 U.S.C. § 1983.

### Third Claim—Retaliation in Violation of the First Amendment
### (42 U.S.C. § 1983)

#### *Against the Individual Defendants*

122.     Plaintiff hereby incorporates the foregoing allegations and further alleges

as follows:

123.     Plaintiff engaged in constitutionally protected speech or conduct through

his association and employment with Legal Aid, which is a non-profit organization that advocates

for criminal justice reform, regularly criticizes DOC policies, and seeks to hold DOC officials

accountable through litigation, including its representation of plaintiffs in *Nunez v. City of New

York*, No. 11-cv-5845 (S.D.N.Y.).

124.     The Individual Defendants were aware of Plaintiff's association and

employment with Legal Aid and of the organization's role in exposing problematic conditions in

City jails and in generating press that was critical of DOC and its officials.

125.     The Individual Defendants' unlawful actions were substantially motivated by a desire to retaliate against, inflict harm on, and score political points against Plaintiff and Legal Aid.

126.     Defendants Molina and Dwyer even went so far as to directly link their false and defamatory statements about Plaintiff to an unrelated incident involving a different Legal Aid employee, thereby demonstrating their retaliatory motive and intent to use Plaintiff as a pawn in their battle with Legal Aid.

127.     As a direct result of the Individual Defendants' retaliatory conduct, Plaintiff suffered multiple concrete injuries, including: (a) deprivations of his rights to be free from false arrest, malicious abuse of process, and due process violations; (b) the deprivation of his liberty interest to engage in his chosen profession free from unreasonable government interference through, among other things, the loss of his OCA Secure Pass; and (c) the deprivation of his rights and liberties under the constitution and laws of the State of New York and ordinances of the City of New York, as detailed in Claims for Relief 6–14.

128.     The Individual Defendants' unlawful actions were intended to prevent and discourage Plaintiff and others from continuing to engage in protected speech and conduct and had a chilling effect on Plaintiff's exercise of his First Amendment rights by burdening and undermining his ability to practice his chosen profession and serve as an effective advocate for his clients.

129.     As a result of the aforementioned acts and omissions, the Individual Defendants violated Plaintiff's First Amendment rights to freedom of association and expression. The Individual Defendants are therefore liable to Plaintiff for damages under 42 U.S.C. § 1983.

## Fourth Claim—Defamation in Violation of the Fourteenth Amendment[13]
## (42 U.S.C. § 1983)

### *Against the Individual Defendants*

130. Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

131. The Individual Defendants deliberately mischaracterized the circumstances of Plaintiff's arrest and knowingly made false statements to the news media that were sufficiently derogatory to cause severe damage to Plaintiff's professional reputation, including the false statements described in paragraphs 105 and 108.

132. These false statements were made with malice and reckless disregard for the truth.

133. As a direct result of, and concomitant with, these false statements, the Individual Defendants caused Plaintiff to suffer multiple state-imposed burdens and alterations of status, including: (a) deprivations of his rights to be free from false arrest, malicious abuse of process, retaliation, and due process violations; (b) deprivation of his liberty interest to engage in his chosen profession free from unreasonable government interference through, among other things, the loss of his OCA Secure Pass; and (c) deprivations of his rights and liberties under the constitution and laws of the State of New York and ordinances of the City of New York, as detailed in Claims for Relief 7–14.

134. As a result of the aforementioned acts and omissions, the Individual Defendants deprived Plaintiff of the due process rights guaranteed to him under the Fourteenth

---

[13] *See Paul v. Davis*, 424 U.S. 693, 701–10 (1976); *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (Sotomayor, J.).

Amendment to the United States Constitution. The Individual Defendants are therefore liable to Plaintiff for damages under 42 U.S.C. § 1983.

## Fifth Claim—Failure to Intervene and Conspiracy
## (42 U.S.C. § 1983)

### *Against the Individual Defendants*

135.    Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

136.    The Individual Defendants failed to intervene to prevent, stop, or report the unlawful and unconstitutional conduct to which Plaintiff was subjected even though they had numerous opportunities to do so.

137.    The Individual Defendants thereby displayed deliberate indifference to Plaintiff's clearly established rights.

138.    The Individual Defendants also agreed among themselves and with other individuals to act in concert and thus conspired to deprive Plaintiff of his clearly established rights.

139.    As a result of the aforementioned acts and omissions, the Individual Defendants caused Plaintiff to suffer the various injuries described in this complaint. The Individual Defendants are therefore liable to Plaintiff for damages under 42 U.S.C. § 1983.

## Sixth Claim—Defamation in Violation of New York Law

### *Against All Defendants*

140.    Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

141. The Individual Defendants knowingly released false statements and information about Plaintiff to the news media, including the false statements detailed herein imputing that Plaintiff had committed a crime or engaged in criminal behavior, which had the ability to and did injure Plaintiff in his trade and profession.

142. The actions of the Individual Defendants severely damaged and continues to damage Plaintiff's reputation, good name, and standing within the community and among his colleagues and peers.

143. The Individual Defendants' actions were undertaken with malice and reckless disregard for the truth.

144. As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as *per se* damages.

145. As a result of the above tortious conduct, the Individual Defendants are liable for punitive damages.

146. The City of New York is liable for the conduct of the Individual Defendants and any damages they caused under the doctrine of *respondeat superior*.

**Seventh Claim—False Arrest and False Imprisonment in Violation of New York Law**

*Against All Defendants*

147. Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

148. Plaintiff was arrested, handcuffed, and detained in the absence of probable cause by the Individual Defendants.

149.     At all times mentioned, said arrest, confinement and restraint of liberty was not otherwise privileged.

150.     Plaintiff was conscious of the confinement and did not consent to such confinement.

151.     As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

152.     As a result of the above tortious conduct, the Individual Defendants are liable for punitive damages.

153.     The City of New York is liable for the conduct of the Individual Defendants and any damages they caused under the doctrine of *respondeat superior*.

### Eighth Claim—Malicious Prosecution in Violation of New York Law

### *Against All Defendants*

154.     Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

155.     The Individual Defendants initiated a prosecution against Plaintiff without probable cause and with malice, and that prosecution resolved in a complete dismissal of the charges, in favor of Plaintiff.

156.     As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

157.     As a result of the above tortious conduct, the Individual Defendants are liable for punitive damages.

158.     The City of New York is liable for the conduct of the Individual Defendants and any damages they caused under the doctrine of *respondeat superior*.

### Ninth Claim—Abuse of Process in Violation of New York Law

### *Against All Defendants*

159.     Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

160.     Without proper excuse or justification and lacking any arguable probable cause basis for doing so, the Individual Defendants improperly utilized regularly issued judicial process in the form of a DAT to retaliate against Plaintiff.

161.     In doing so, the Individual Defendants intended to inflict harm on Plaintiff and the organization he worked for and/or to use the process to obtain collateral objectives including but not limited to political points and a public relations victory for Defendant Molina and DOC.

162.     As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

163.     As a result of the above tortious conduct, the Individual Defendants are liable for punitive damages.

164.     The City of New York is liable for the conduct of the Individual Defendants and any damages they caused under the doctrine of *respondeat superior*.

**Tenth Claim—Violations of N.Y.C. Admin. Code §§ 8-801 to 8-807**

*Against All Defendants*

165. Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

166. Plaintiff's right to be free from unreasonable searches and seizures, as codified in 2021 N.Y.C. Local Law No. 48, N.Y.C. Admin. Code § 8-802, was violated by the conduct of the Individual Defendants.

167. As a result of the above unlawful conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

168. Qualified immunity is no defense to this claim pursuant to N.Y.C. Admin. Code § 8-804.

169. As a result of the above unlawful conduct, the Individual Defendants are liable for compensatory and punitive damages.

170. The City of New York is liable as the employer of the Individual Defendants under N.Y.C. Admin. Code § 8-803(b).

**Eleventh Claim—Assault and Battery in Violation of New York Law**

*Against All Defendants*

171. Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

172. The aforementioned actions of the Individual Defendants constituted an assault and battery of Plaintiff under New York law for which said Defendants are answerable in

damages and for which the City of New York is vicariously liable for under the doctrine of *respondeat superior*.

### Twelfth Claim—Intentional and Negligent Infliction of Emotion Distress in Violation of New York Law

#### *Against All Defendants*

173.    Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

174.    The Individual Defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff.

175.    As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

176.    As a result of the above tortious conduct, the Individual Defendants are liable for punitive damages.

177.    The City of New York is liable for the conduct of the Individual Defendants and any damages they caused under the doctrine of *respondeat superior*.

### Thirteenth Claim—Negligent Hiring, Screening, Training, Supervision, and Retention

#### *Against Defendant City of New York*

178.    Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

179.    At all relevant times, the City was under a duty to exercise reasonable care in the hiring, training, supervision, and retention of its employees.

180. The aforementioned acts and omissions of the Individual Defendants were the direct and proximate cause of injury and damage to Plaintiff and resulted from the negligence of the City in the hiring, screening training, supervision, and retention of said employees.

181. Although the City and its agents and employees were aware prior to the events giving rise to the claims alleged herein that the Individual Defendants were unfit and unqualified to function as officers and officials because, among other things, these individuals had engaged malfeasance, acts, and omissions in the past similar to that alleged herein, the City nevertheless retained the Individual Defendants and failed to properly train or supervise these Defendants.

182. As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

**Fourteenth Claim—Violations of the New York State Constitution**

*Against All Defendants*

183. Plaintiff hereby incorporates the foregoing allegations and further alleges as follows:

184. The aforementioned acts and omissions of the Individual Defendants breached the protections guaranteed to Plaintiff by the New York State Constitution, including but not limited to by Article I, Sections 1, 6, 8, and 12.

185. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff's rights, privileges, and immunities guaranteed by the New York State Constitution were violated.

186. As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

187. As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

188. The City of New York is liable for the conduct of the Individual Defendants and any damages they caused under the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against the Individual Defendants and the City of New York:

A.   A trial by jury;

B.   A judgment ordering all Defendants to pay compensatory damages in an amount to be determined at trial;

C.   A judgment ordering punitive damages against the Individual Defendants, in an amount sufficient to deter such conduct in the future;

D.   A judgment declaring that the statements authored and published by the Individual Defendants to reporters from the New York Post and identified within this complaint, individually and collectively, were and are false;

E.   Attorneys' fees, costs, and interest, pursuant to 42 U.S.C. §§ 1983, 1988, and N.Y.C. Admin. Code § 8-805(a)(2); and

F.   Such other and further relief as the Court deems appropriate and equitable.

Dated:  Brooklyn, New York
        February 6, 2025


KOPKE CHRISTIANA & RASTETTER LLP


By:    */s/Clyde Rastetter*
       Clyde M. Rastetter
       clyde@kcrllp.com
       */s/ Andrew Kopke*
       Andrew J. Kopke
       andrew@kcrllp.com
       199 Cook Street, Suite 308
       Brooklyn, NY 11206
       t: (917) 451-9525
       f: (347) 315-9815

       *Attorneys for Plaintiff*